**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**

**WILLIAM OGLESBY,**

                **Plaintiff,**

**v.**                                                            **Civil Action No: 2:04cv768**

**FORD MOTOR COMPANY,**

                **Defendants.**

**ORDER**

This matter is before the Court on Defendant's Motion for Summary Judgment.  The

Court **GRANTS** the Motion as explained below.

**PROCEDURAL HISTORY**

Plaintiff William Oglesby filed a complaint against Defendant Ford Motor Company on

December 21, 2004 (Doc. 1).  The complaint alleged that Defendant had engaged in unlawful

employment practices under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e), *et.*

*seq*. and the Virginia Human Rights Act, Va. Code § 2.21714 *et. seq*.  Specifically, the complaint

sets forth claims of hostile environment, retaliation, and disparate treatment.  Defendant filed an

answer on February 2, 2005 (Doc. 3) and a motion for summary judgment on June 17, 2004

(Doc. 9).  Plaintiff's response was due July 7, 2005 and as of July 28, 2005, it had not been filed.

On July 28, 2005, the Court notified the parties that it was **GRANTING** Defendant's Motion for

Summary Judgment.  This Order explains the Court's rationale.

**FACTUAL BACKGROUND**

As stated above, Plaintiff has not responded to Defendant's Motion for Summary

Judgment. "In determining a motion for summary judgment, the Court may assume that facts identified by the moving party in its listing of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion." E.D. VA. LOCAL R. CIV. P. 56. Therefore, to the extent that the undisputed facts are supported by the proffered evidence, the Court will accept them as true for purposes of this motion; however, if any of the undisputed facts are contradicted by the proffered evidence, the Court will consider those facts disputed. Despite the fact that Plaintiffs have not proffered any evidence, the Court will view the evidence proffered by Defendant, including Plaintiff's deposition, in the light most favorable to Plaintiff for purposes of determining whether the proffered evidence supports Plaintiff's claims.

On June 28, 1993, Plaintiff began working for Ford as a Chassis Assembler at Ford's assembly plant in Edison, New Jersey. See Defendant's Statement of Undisputed Facts 1 ("Defendant's Facts 1"), citing Plaintiff's Complaint at V.1. On March 25, 2002, Plaintiff transferred to Ford's Norfolk Assembly Plant ("NAP"). See Defendant's Facts 2, citing Deposition of William Oglesby at 49 ("Plaintiff's Dep.") (App. Tab A to Defendant's Memorandum). Plaintiff has worked at NAP since March 2002. See Defendant's Facts 3, citing Complaint V.2. During all periods of Plaintiff's employment at NAP, Ford has employed more than 500 people. See Defendant's Facts 4, citing Complaint at III & Answer at III.5.

In April 2002, Plaintiff was assigned to the brake-fill operation during the day shift. See Defendant's Facts 5, citing Plaintiff's Dep. at 57-58. As a brake-fill operator, Plaintiff connected filling equipment to units on the assembly line in order to fill the units with brake and power steering fluid. See Defendant's Facts 6, citing Plaintiff's Dep. at 64. Of the three to five

2

hundred units that Plaintiff would fill each day, twenty to thirty were "no-fills."  See Defendant's

Facts 7, citing Plaintiff's Dep. at 75.  No other brake-fill operator generated as many no-fills as

Plaintiff.  See Affidavit of Mike Love ("Love Aff. ") at ¶ 6 (App. Tab. B to Defendant's

Memorandum); affidavit of Kevin Kelly ("Kelly Aff.") at ¶ 7 (App. Tab. C to Defendant's

Memorandum).  Plaintiff believed his no-fills were caused by the problems with the brake-fill

equipment. See Defendant's Facts 8, citing Plaintiff's Dep. at 69.

From approximately April 2002 to October 2002, Mike Love supervised Plaintiff on this

brake-fill operation.  See Defendant's Facts 9, citing Plaintiff's Dep. at 62; Love Aff. at ¶¶ 4-5.

Love is held responsible for defects generated by employees and repeatedly questioned Plaintiff

about the "no-fills".  See Plaintiff's Dep. at 92; Love Aff. at ¶¶ 7-8.  Plaintiff attributed his no-

fills to the equipment; consequently, Love asked Plaintiff to attend several Variation Reduction

Team meetings during which Plaintiff could share his concerns regarding the equipment. See

Defendant's Facts 11, citing Plaintiff's Dep. at 85, Love Aff. at ¶¶ 14-16.  Plaintiff attended two

or three of those meetings and was paid for his attendance.  See Defendant's Facts 12, citing

Plaintiff's Dep. at 87, Love. Aff. at ¶¶ 14-15. Certain changes were made to the brake-fill

operation to address Plaintiff's concerns.  See Defendant's Facts 13, citing Plaintiff's Dep. at 89.

Nevertheless, Plaintiff's no-fills persisted.  See Defendant's Facts 14, citing Plaintiff's Dep. at

131, Love Aff. at ¶ 16.

Plaintiff alleges in this lawsuit that Love harassed him because of his race, African-

American.  See Defendant's Facts 15, citing Compliant at V.7.[1]   According to Plaintiff, the

---

[1] Oglesby filed a grievance against Love on September 3, 2002, through the UAW, alleging violations of
Ford's "Zero Tolerance" anti-discrimination policy.  See Defendant's Facts 48, citing Plaintiff's Dep. at 92 & Ex. 4
to Plaintiff's Dep.  Ford investigated Oglesby's allegations and concluded, on October 7, 2002, that no violation of

allegedly harassing conduct consisted of Love's frequent questioning of Plaintiff about no-fills on the brake-fill operation.  <u>See</u> Defendant's Facts 15, citing Plaintiff's Dep. at 93:5-7; 94:3-11. During Plaintiff's numerous interactions with Love regarding no-fills on the brake-fill operation, Love never raised his voice toward Plaintiff, never used foul language or a racial or derogatory term, and never touched or threatened to touch Plaintiff.  <u>See</u> Defendant's Facts 16, citing Plaintiff's Dep. at 94:3, 95:17; Love Aff. at ¶ 8.  Plaintiff never felt physically threatened or intimidated by Love.  <u>See</u> Defendant's Facts 16, citing Plaintiff's Dep. at 95:4-5.

Plaintiff was never formally disciplined while under the supervision of Love.  <u>See</u> Defendant's Facts 21, citing Plaintiff's Dep. at 98; Love Aff. at ¶ 10.  Love never suspended Plaintiff or caused him to lose pay.  <u>See</u> Defendant's Facts 22, citing Plaintiff's Dep. at 99. Plaintiff contends that he lost some pay when he voluntarily left work early on some occasions because he was aggravated by Love's questioning about his no-fills, but Plaintiff acknowledges that the decision to go home was his personal choice. <u>See</u> Defendant's Facts 23, citing Plaintiff's Dep. at 98-99.

Plaintiff also asserts that Love conspired with three white employees -- Kevin Dodson, Mark Hanna and Mark Hardison – to sabotage his operation by encouraging those employees to create no-fills while Plaintiff was on break or in the restroom.  <u>See</u> Defendant's Facts 17, citing Plaintiff's Dep. at 123-24.  Plaintiff further asserts that Love would gather with other employees and talk and point in the direction of the brake-fill operation, <u>see</u> Defendant's Facts 20, citing Plaintiff's Dep. at 125, although he does not know what Love and the employees were discussing

the Zero Tolerance policy had occurred.  <u>See</u> Defendant's Facts 49, citing Plaintiff's Dep. at 203-05 & Ex. 4 to Plaintiff's Dep.  Oglesby appealed the dismissal of this grievances at several levels, but each time his appeal was denied.  <u>See</u> Defendant's Facts 50, citing Exs. 6, 9, 10 to Plaintiff's Dep.

or why they pointed toward the brake-fill operation, see id. at 125, 127.

Plaintiff never saw anyone sabotage his operation, see Defendant's Facts 18, citing Plaintiff's Dep. at 126:2-3.  He only heard from a coworker, Mike Shaw, that Dodson, Hanna and Hardison would not connect the equipment to the units during periods when Plaintiff was on break.  See Defendant's Facts 18, citing Plaintiff's Dep. at 124.  Dodson, Hanna and Hardison deny that Love instructed them to sabotage Plaintiff's operation and that they ever sabotaged Plaintiff's work.  See Defendant's Facts 19, citing Affidavit of Kevin Dodson ("Dodson Aff.") (App. Tab D to Defendant's Memorandum) at ¶ 10; Affidavit of Mark Hanna ("Hanna Aff.") (App. Tab E to Defendant's Memorandum) at ¶ 10; Affidavit of Mark Hardison ("Hardison Aff.") (App. Tab F to Defendant's Memorandum)  ¶ 10.  Love also denies encouraging Dodson, Hanna or Hardison to sabotage Plaintiff's operation.  See Defendant's Facts 19, citing Love Aff. at ¶ 19. Plaintiff was never disciplined for any no-fills allegedly caused by employees covering his position while he was on break.  See Defendant's Facts 24, Plaintiff's Dep. at 127:21-24.

In November 2002, Love rotated to the night shift in accordance with the standard schedule for NAP supervisors, and Kevin Kelly became Plaintiff's supervisor.  See Defendant's Facts 25, citing Plaintiff's Dep. at 130; Love Aff. at ¶ 3; Kelly Aff. at ¶ 4.  Plaintiff continued to have problems with no-fills while Kelly was his supervisor.  See Defendant's Facts 26, citing Plaintiff's Dep. at 131; Kelly Aff. at ¶¶ 6-7.  Plaintiff asserts that Kelly harassed him once or twice a week by questioning him about the no-fills.  See Defendant's Facts 27, citing Plaintiff's Dep. at 132-33.  When questioning Plaintiff about the no-fills, Kelly never raised his voice, never used foul language or a racial or derogatory term, and never threatened to make any physical contact with Plaintiff.  See Defendant's Facts 28, citing Plaintiff's Dep. at 133-34; Kelly Aff. at ¶

5

9.  Plaintiff never felt physically threatened or intimidated by Kelly.  See Defendant's Facts 28, citing Plaintiff's Dep. at 133.

Plaintiff asserts that on one occasion he entered Kelly's office and saw on Kelly's computer screen an email to Love with "Kenny Oglesby" in the text.  See Defendant's Facts 29, citing Plaintiff's Dep. at 134:18-35:16.  Plaintiff does not know the subject or contents of the email.  See id. at 135.  Plaintiff further states that Kelly would gather with white employees and talk and point in Plaintiff's direction, but Plaintiff does not know what Kelly was discussing with the white employees or why they were pointing in his direction.  See Defendant's Facts 30, citing Plaintiff's Dep. at 137:8-138:3.

On November 20, 2002, Kelly transferred Plaintiff from the brake-fill operation to the tie-rod operation.  See Defendant's Facts 31, citing Plaintiff's Dep. at 138:21-22, 147:6-18; Kelly Aff. at ¶¶ 16.[2,3]  The tie-rod position was equal in pay and level to Plaintiff's brake-fill position. See Defendant's Facts 34, Plaintiff's Dep. at 151.  Plaintiff also remained on the day shift after

---

[2] Plaintiff filed a grievance against Kelly on November 25, 2002, alleging violations of Ford's Zero Tolerance policy.  See Defendant's Facts 50, citing Plaintiff's Dep. at 205-06 & Ex. 5 to Plaintiff's Dep.  Ford investigated Plaintiff's allegations and concluded, on February 21, 2003, that no violation of the Zero Tolerance policy had occurred.  See Defendant's Facts 51, citing Ex. 5 to Plaintiff's Dep..  Plaintiff appealed the dismissal of this grievance at several levels, but each time his appeal was denied.  See Defendant's Facts 52, citing Exs. 6, 9, 10 to Plaintiff's Dep.

[3] On December 3, 2002, Plaintiff filed a Charge of Discrimination with the EEOC.  See Defendant's Facts 57, citing Plaintiff's Dep. at 192 & Ex. 2 to Plaintiff's Dep.  Plaintiff's EEOC charge alleged that Love and Kelly harassed him about his job performance and that he was retaliated against.  The charge further alleged that Plaintiff was treated differently than other employees because of his race.  See Defendant's Facts 58, citing Plaintiff's Dep. at 192 & Ex. 2 to Plaintiff's Dep.  The charge made no allegations concerning Plaintiff's removal from final line inspector, as those events had not yet occurred.  See Defendant's Facts 60, citing Plaintiff's Dep. at 192 & Ex. 2 to Plaintiff's Dep.  There is no evidence that Plaintiff amended his EEOC charge at any time to address his removal from the final line inspector position or that he filed a separate charge related to that allegedly discriminatory act. The EEOC dismissed Plaintiff's charge and informed him of his right to sue in a letter dated September 20, 2004. See Defendant's Facts 61, citing Ex. 15 to Plaintiff's Dep.

the transfer.  See id. at 147.  Plaintiff contends that the tie-rod job was less desirable than the

brake-fill position because it was more physically challenging.  See Defendant's Facts 35,

Plaintiff's Dep. at 148.  All hourly production jobs at NAP are evaluated using Modular

Arrangement or Pre-Determined Time Standards ("MODAPTS") and Automated Methods

Analysis Time Standards ("AUTOMATS") to establish their work standards.  See Defendant's

Facts 36, citing Affidavit of Charles Broach ("Broach Aff.") (App. Tab G to Defendant's

Memorandum) at ¶ 7. The tie-rod operation is not more challenging than the brake-fill operation

according to those standards.  See id.

Although Plaintiff alleges that Kelly transferred him to the tie-rod operation in retaliation

for his filing a grievance against Love, see Defendant's Facts 37, citing Complaint at V.13-14,

Kelly states that he transferred Plaintiff because Plaintiff had expressed concerns about the safety

of the brake-fill equipment and indicated that he did not feel safe working at that operation, see

Defendant's Facts 32, citing Kelly Aff. at ¶¶ 10-16.  Plaintiff denies expressing his safety

concerns directly to Kelly, but acknowledges that he did question whether the brake-fill operation

was in compliance with safety guidelines and that he did so because a worker on a different shift

was nearly hit in the head by the equipment on three occasions.  See Defendant's Facts 33, citing

Plaintiff's Dep. at 144-45.

Plaintiff testified that Kelly did not know about Plaintiff's grievance.  See Defendant's

Facts 37, citing Plaintiff's Dep. at 130:18-20.  Further, Kelly states that he had no knowledge of

Plaintiff's grievance against Love when Kelly decided to remove him from the brake-fill

operation.  See Defendant's Facts 37, citing Kelly Aff. at ¶ 20.

At some point after he was transferred to the tie-rod job operation on November 20, 2002,

7

Plaintiff was injured.  See Plaintiff's Dep. 158:6-9.  At that time, he became a floater filling in for others at the plant.  See id. 158:10-12.

In March 2003, Plaintiff signed a posting for a position as a final line inspector.  See Defendant's Facts 38, citing Plaintiff's Dep. at 158.  The posted positions were for final line inspector jobs either on a "bubble team" performing tests for the launch of the 2004 F-150 truck or as replacements for bubble team members.  See Defendant's Facts 39, citing Affidavit of Scott Porter ("Porter Aff.") (App. Tab H to Defendant's Memorandum) at ¶¶ 6-10.  Although the posting did not state that it was for a temporary position, both Ford and the local chapter of the International Union, United Automobile, Aerospace & Agricultural Implement Workers of America ("UAW") agreed that the positions would be temporary since they were created for purposes of the product launch.  See Defendant's Facts 40, citing Porter Aff. ¶ 11. Plaintiff received a torque final line inspector position, where he filled in for an employee who had been assigned to a position on the bubble team.  See Defendant's Facts 41, citing Porter Aff. at ¶ 17. The final line inspector position paid approximately $25.58 per hour, which was forty cents higher than Plaintiff's prior Chassis Assembly positions.  See Defendant's Facts 42, citing Plaintiff's Dep. at 159-60.  The torque final line inspector position entailed inspecting nuts and bolts for appropriate tightness.  See id. at 159.

The 2004 F-150 truck launched in May 2003, and the bubble team disbanded in October 2003.  See Defendant's Facts 43, citing Porter Aff. at ¶¶ 26-30.  Each member of the bubble team returned to their prior positions when the bubble team disbanded.  See id.  Plaintiff returned to Chassis Assembly, the area where he worked before filling in for a member of the bubble team. See id. at ¶ 30.

Plaintiff states in his deposition, "I learned that the whites were still in the final– holding final line positions on a different shift than I was."  Plaintiff's Dep. 203:3-6.  In his complaint, Plaintiff identifies two white employees, Laurie Gamet and Czeslaw Turko, Jr., who allegedly retained their positions as final line inspectors after the bubble team disbanded.  See Defendant's Facts 45, citing Complaint at V.17.   Turko was never part of the bubble team and never filled in for any individual on the bubble team.  See Defendant's Facts 46, citing Porter Aff. at ¶ 32. Turko became a permanent final line inspector at the end of the assembly line before the bubble team was even formed.  See id.  Consequently, he was not removed from his position when the bubble team disbanded. See id.  Ms. Gamet filled in for another employee who was temporarily assigned to the bubble team, covering that employee's position as a Chassis Final Line Inspector. See Defendant's Facts 47, citing Porter Aff. at ¶ 31.  Before receiving this temporary assignment, Ms. Gamet worked in the Trim Department.  See id. When the bubble team disbanded, Ms. Gamet returned to her old position in the Trim Department. See id.  Due to a clerical error, Ford continued to pay Ms. Gamet at the final line inspector rate for some time after the bubble team disbanded, but it corrected this clerical error immediately upon its discovery.  See id.

On April 5, 2004, Plaintiff filed a charge against his local UAW with the National Labor Relations Board ("NLRB") alleging that the UAW violated his rights by "withdrawing his grievance and not processing it any further for discriminatory, arbitrary or invidious reasons." See Defendant's Facts 53, citing Plaintiff's charge, Ex. 12 to Plaintiff's Dep.  At the same time, Plaintiff filed an NLRB charge against Ford alleging that Ford removed him from his position as final line inspector because of his "membership in a labor organization and/or because of his protected concerted activities."  See Defendant's Facts 54, Plaintiff's charge, Ex 11 to Plaintiff's

9

Dep.  Plaintiff later withdrew this charge at the recommendation of an NLRB investigator.  See

Defendant's Facts 54, Plaintiff's Dep. at 220-23.  The NLRB Region refused to issue a complaint

against the local UAW, prompting Plaintiff to appeal to the NLRB General Counsel.  The

General Counsel affirmed the Region's decision.  See Defendant's Facts 55, Exs. 13, 14 to

Plaintiff's Dep.  Regarding Plaintiff's claim that he was wrongfully removed from the final line

inspector position, the NLRB General Counsel specifically found that "the Union had negotiated

with the Employer prior to posting the positions, and agreed with the employer that the positions

would be temporary until the completion of a specific line of vehicles."  See Defendant's Facts

56, Ex. 14 to Plaintiff's Dep.

## SUMMARY JUDGMENT STANDARD

District courts may enter summary judgment only when there is no genuine issue of

material fact and the movant is entitled to judgment as a matter of law.  Miller v. Leathers, 913

F.2d 1085, 1087 (4th Cir. 1990) (en banc) *cert. denied*, 498 U.S. 1109 (1991).  The facts and

inferences to be drawn from the pleadings must be viewed in the light most favorable to the

nonmoving party.  Nguyen v. CNA Corp., 44 F.3d 234, 237 (4th Cir. 1995).  Summary judgment

is appropriate when the record, taken as a whole, could not lead a rational trier of fact to find for

the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-49 (1986).

In order to defeat a motion for summary judgment, a plaintiff cannot rely on "mere belief

or conjecture, or the allegations and denials contained in his pleadings."  Doyle v. Sentry Insur.,

877 F. Supp. 1002, 1005 (E.D. Va. 1995) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 324

(1986)).  Rather, the nonmoving party must set forth specific facts through affidavits,

depositions, interrogatories, or other evidence to show genuine issues for trial.  Celotex, 477 U.S.

at 324.  When a plaintiff fails to make a sufficient showing establishing an essential element of his case and the plaintiff bears the burden of proof on that issue, "there is 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  Chelates, 477 U.S. at 322; see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254 (1986).

While "it is the province of the jury to resolve conflicting inferences from circumstantial evidence, ... it is the duty of the court to withdraw the case from the jury when the necessary inference is so tenuous that it rests upon speculation and conjecture."  Ford Motor Co. v. McDavid, 259 F.2d 261 (4th Cir. 1958).  Such an approach protects against the danger that a jury will make a decision based on sheer speculation, tainted by impermissible factors such as jury sympathy.  Lovelace v. Sherwin-Williams Co., 681 F.2d 230, 242 (4th Cir. 1982).

<u>ANALYSIS</u>

## I.      Hostile Environment

From the proffered evidence, the jury could not find for the Plaintiff on his claim under Title VII that he was subjected to a hostile environment.

To survive summary judgment on his claim of a hostile work environment, Plaintiff must demonstrate that a reasonable jury could find that Defendant's harassment was "(1) unwelcome; (2) based on race; and (3) sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere."  Spriggs v. Diamond Auto Glass, 242 F.3d 179, 183-184 (4th Cir. 2001), citing Causey v. Balog, 162 F.3d 795, 801 (4th Cir. 1998).  The degree of hostility or abuse must be determined by examining the totality of the circumstances.  See Spriggs v. Diamond Auto Glass, 242 F.3d 179, 184 (4th Cir. 2001), Harris v. Forklift Sys., Inc., 510 U.S.

17, 23. (1993).  "Title VII does not provide a remedy for every instance of verbal or physical

harassment in the workplace."  <u>Lissau v. Southern Food Serv.</u>, 159 F.3d 177 at 183 (4th Cir.

1998), citing <u>Oncale v. Sundowner Offshore Servs., Inc.</u>, 523 U.S. 75 (1998); "[s]imple teasing,

offhand comments, and isolated incidents (unless extremely serious) will not amount to

discriminatory changes in the terms and conditions of employment." <u>Lissau v. Southern Food

Serv.</u>, 159 F.3d 177, 183 (4th Cir. 1998), quoting <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775,

788 (1998) (citations omitted).

In Plaintiff's deposition proffered in part, Plaintiff describes five bases for his claim of

hostile environment.

<u>1. Supervisors Love and Kelly's questioning about the no-fills on the brake-fill operation.</u>

Plaintiff proffers no evidence that these questions were racially motivated.  Plaintiff

proffers that Love and Kelly consistently questioned him about no-fills on the brake-fill

operation; however, Plaintiff admits that neither Love nor Kelly ever used a racial term when

speaking to him.  <u>See</u> Plaintiff's Dep. at 95:33-34.  Further, Kelly and Love stated that they were

ultimately responsible for defects in their zone and therefore were responsible for addressing the

no-fills.  Plaintiff admits that he had twenty to thirty no-fills per shift, <u>see</u> Plaintiff's Dep. at

75:21-24, which is more than the other brake-fill operators had.  <u>See</u> Kelly Aff. ¶ 7; Love Aff. ¶

6.

Further, a jury could not find from the proffered evidence that the alleged harassment was

sufficiently severe or pervasive.  Plaintiff asserts that Love would question him several times a

day (Plaintiff's Dep. at 94:6-11) and that Kelly would question him once or twice a week (<u>id.</u> at

132:9-10), but neither ever used foul language (<u>id.</u> at 94:20-22; 133:16-17), never physically

threatened intimidated him (id. at 95:4-5; 133:20-22), never touched him (id. at 94:22:-25, 133:18-19), and never used a racial slur, (id. at 95:14-17, 133:23-134:1).  See also Kelly Aff. ¶ 9, Love Aff. ¶ 8.  Compare with Spriggs v. Diamond Auto Glass, 242 F.3d at 185-186 (finding manager's use of the words "nigger" and "monkey" to be sufficiently severe and pervasive).  The most a jury could find is that Love raised his voice once during this questioning.  Plaintiff's Dep. at 94:17-19.  Questioning of this type, even if it occurred several times a day does not amount to discriminatory changes in the terms and conditions of employment.  See Lissau v. Southern Food Serv., 159 F.3d 177, 183 (4th Cir. 1998).

2. Love and Kelly gathering white workers together and talking and pointing in his direction.

A jury could find from the proffered evidence that Love and Kelly gathered white workers together and talked and pointed in Plaintiff's direction, see Plaintiff's Dep. at 125, 137; however, Plaintiff does not proffer any evidence that his race was the basis of their actions.  Plaintiff admits that he never heard what the employees were discussing and did not know why they pointed in his direction.  See Plaintiff Dep. at 125-27, 137.

Further, Plaintiff has not proffered evidence that this behavior was sufficiently severe.  Even if Love, Kelly, and the workers were making negative comments about Plaintiff,  "[s]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment."  Lissau v. Southern Food Serv., 159 F.3d 177, 183 (4th Cir. 1998), quoting Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998) (citations omitted).

3. Love directed Dodson, Hana and Hardison to sabotage his operation while he was on

13

break.

A jury could not find from the proffered evidence that this sabotage even occurred, much less that it was based on Plaintiff's race.  Plaintiff states that he never saw this happen, see Plaintiff's Dep. at 126:2-3; instead, he relies on the statement of a co-worker who told him that the three employees were causing no-fills when filling in for Plaintiff while he was on break.  See Plaintiff's Dep. at 124.  As such, Plaintiff's deposition testimony on this point is based on hearsay and "hearsay evidence, which is inadmissible at trial, cannot be considered on a motion for summary judgment."  Md. Highway Contractors Ass'n v. Maryland, 933 F.2d 1246, 1251 (4th Cir. 1991).  Plaintiff also asserts that he knew they were sabotaging his work because Love and these workers would stand around and point in his direction, see Plaintiff's Dep. 125:14-16; however, "[m]ere speculation by the non-moving party cannot create a genuine issue of material fact."  Cox v. County of Prince William, 249 F.3d 295, 299 (4th Cir. 2001).  Further, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient" to defeat a motion for summary judgment.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).

### 4. Love threatening to fire Plaintiff

Plaintiff proffers that Love threatened him with disciplinary action, including removing him from the operation and firing him.  See Plaintiff's Dep. at 101:16-19. Plaintiff again has not proffered any evidence from which a jury could find that Love threatened him because of his race.  In fact, Plaintiff's deposition testimony reveals that the no-fills were the reason for Love's alleged threats.  Plaintiff states, "He told me if I did not – if the no-fills did not improve, that he

was going to remove me from the operation and, if necessary, fire me."  Id. at 101:22-24.[4]

5. Email from Kelly to Love

Plaintiff states that he saw an email on Kelly's screen with "Mike Love" in the heading and "Kenny Oglesby" in the text.  Id. at 134:18-35:16.  He states that he could not read it because Kelly shut the computer down when he realized Plaintiff was standing behind him.  Id. at 135.  Again, Plaintiff has proffered no evidence of the content of the email or that it was sent because of his race, and "[m]ere speculation by the non-moving party cannot create a genuine issue of material fact."  Cox v. County of Prince William, 249 F.3d 295, 299 (4th Cir. 2001).

Thus, the Court **DENIES** Plaintiff's claim of hostile environment.

## II.    **Disparate Treatment**

Plaintiff is barred from bringing a disparate treatment claim under Title VII based on his removal because he did not raise that ground in his EEOC charge.

In a suit under Title VII, the "suit filed may encompass only the 'discrimination stated in the charge itself or developed in the course of a reasonable investigation of that charge.'"  King v. Seaboard Coast Line R. Co. 538 F.2d 581, 583 (4th Cir. 1976), quoting Equal Employment

---

[4]The Court notes that to the extent that the threatened disciplinary action or the act of removing him from the operation would be consistent with the basic employment policies of the Defendant, the threat of such action would not be sufficiently severe or pervasive to alter the conditions of employment. See Von Gunten v. Maryland, 243 F.3d 858, 869 (4th Cir. 2001) ("Terms, conditions, or benefits of persons employment do not typically, if ever, include general immunity from the application of basic employment policies...."). Although the Von Gunten Court was analyzing whether harassment could constitute an adverse employment action for a retaliation claim under Title VII, the Court finds that dicta applicable to this Court's analysis of Plaintiff's hostile environment claim under Tittle VII.

The Court also notes that the firing would not have been consistent with policies at the time Love made that threat, see Plaintiff's Dep. at 103:1-25, 104:1-2; however, because Plaintiff did not proffer evidence that Love threatened him because of his race, the Court will not address whether these threats would be sufficiently severe or pervasive to alter the conditions of employment.

Opportunity Commission v. General Elec. Co. 532 F.2d 359, 365 (4th Cir. 1976).   Compare

Presnell v. Seibels, Bruce & Co., No. 90-2691, 1991 WL 113612 (4th Cir. July 17, 1991)

(unpublished) (affirming the district court decision to strike plaintiff's allegation of

discriminatory discharge from the complaint); Doyle v. Sentry Ins., 877 F.Supp 1002, 1007

(E.D.Va. 1995) (granting summary judgment on Plaintiff's discriminatory discharge claim

because the plaintiff had only raised promotional discrimination in the EEOC charge), with

Equal Employment Opportunity Commission v. General Elec. Co., 532 F.2d 359, 368 (4th Cir.

1976) (reversing a district court grant of summary judgment on Plaintiff's sex discrimination

claim; finding that although the employee's EEOC charge only alleged that the employment test

discriminated on the basis of race, the EEOC could easily discover that the test also

discriminated on the basis of sex when examining the test).

Here, Plaintiff filed a charge of discrimination with the EEOC alleging that Love and

Kelly harassed him about his job performance and that he was retaliated against.  See Plaintiff's

Dep. at192; see Ex. 2 to Plaintiff's Dep.  In the charge dated December 3, 2002, Plaintiff did not

mention his removal as a final line inspector as that event occurred October 20, 2003.  See Ex. 2

to Plaintiff's Dep.  Further, Plaintiff has not proffered that he amended the charge.

Further, Plaintiff's claim of disparate treatment in his removal as a final line inspector

would not have arisen in the course of a reasonable investigation of Plaintiff's harassment and

retaliation claims.  Plaintiff's harassment and retaliation claims to the EEOC and the Virginia

Human Rights Commission were based on his job as a brake-fill operator from July 15, 2002 and

November 19, 2002 under supervisors Love and Kelly.  See Ex. 2 to Plaintiff's Dep.  Plaintiff's

disparate treatment claim is based on a different job (final line inspector[5]) at a different time

(around October, 20 2003[6]) under different supervisors (Lee and Porter[7]) in a different area of the

plant (trim department[8]).

Thus, the Court **DISMISSES** the Plaintiff's disparate treatment claim on procedural

grounds.[9]


## III.  Retaliation

From the proffered evidence, a jury could not find for Plaintiff on his claim for retaliation

under Title VII; Plaintiff has not made a prima facie case.

It is unlawful "for an employer to discriminate against any of his employees . . . because

[the employee] has opposed any practice made an unlawful employment practice by [Title VII],

or because [the employee] has made a charge, testified, assisted, or participated in any manner in

an investigation, proceeding, or hearing under [Title VII]."  Title VII of the Civil Rights Act of

---

[5] See Plaintiff's Dep. at 165.

[6] See Plaintiff's Dep. at 164:18-19.

[7] See Plaintiff's Dep. at 165:13-15.

[8] See Plaintiff Dep. at 165:3-4.

[9] Even if Plaintiff's disparate treatment claim was not barred on procedural grounds, Plaintiff's claim would fail.  Defendants have proffered a legitimate non-discriminatory reason why the final line inspector's position appeared to Plaintiff to remain open to similarly qualified applicants after his removal.  In his complaint, Plaintiff identifies Laurie Gamet and Czeslaw Turko, Jr. as employees who remained in the final line position after he was removed.  See Complaint at V.17.  Turko was never a part of the bubble team; he was a final line inspector before the bubble team was formed.  Porter Aff. at ¶ 32.  Gamet was given a temporary assignment as final line inspector to fill in for an employee temporarily assigned to the bubble team.  Id. at ¶ 31.  When the bubble team disbanded, Gamet returned to her old position.  Due to a clerical error, Ford continued to pay Gamet at the final inspector rate, but corrected the error upon its discovery.  Id.

1964, 42 U.S.C. § 2000e-3(a).

Plaintiff alleges that Defendant retaliated against him for filing a grievance against Love by transferring him to the tie-rod position; however, Plaintiff does not proffer any direct evidence to support this claim.  Therefore, the Court will apply the burden-shifting framework articulated in McDonnell Douglas Corp v. Green, 411 U.S. 792 (1973) ("McDonnell Douglas").[10]  See Causey v. Balog, 162 F.3d 795, 800 (4th Cir. 1998).  Under this framework, Plaintiff must first proffer evidence that makes a prima facie case of retaliation.  McDonnell Douglas, 411 U.S. at 802.  If Plaintiff is able to do this, the burden shifts to Defendant to articulate a legitimate nondiscriminatory reason for the challenged actions.  Id.  Once Defendant does this, the burden shifts back to Plaintiff to prove by a preponderance of evidence that the Defendant's articulated reason is merely a pretext for discrimination.  Hawkins v. PepsiCo, Inc., 203 F.3d 274, 278 (4th Cir. 2000).  The Defendant's proffered reason is not pretextual "unless it is shown both that the reason was false, and that discrimination was the real reason."  St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502(1993). "If the plaintiff fails to evidence a genuine dispute of fact over the employer's nondiscriminatory reason, he has not satisfied his burden and the defendant may prevail as a matter of law."  Doyle v. Sentry Ins. 877 F.Supp. 1002,1006 (E.D.Va.1995), citing Mitchell v. Data General Corp., 12 F.3d 1310, 1317(4th Cir. 1993).

**The proffered evidence does not make a prima facie case for Plaintiff's retaliation claim.**

To establish a prima facie case of retaliation, a plaintiff must proffer evidence that

---

[10] The McDonnell Douglas burden-shifting framework also applies to retaliation claims.  See Karpel v. Inova Health Sys. Servs., 134 F.3d 1222, 1228 (4th Cir. 1998).

supports three elements: (1) that he engaged in protected activity, (2) that an adverse employment action was taken against him, and (3) that there was a causal link between the protected activity and the adverse employment action.  See Laughlin v. Metropolitan Wash. Airports Auth., 149 F.3d 253, 258 (4th Cir. 1998).

### 1. that Plaintiff engaged in a protected activity

It is undisputed that Plaintiff filed a grievance against Love on September 2, 3002 through the UAW, alleging violations of Ford's "Zero Tolerance" anti-discrimination policy. See Plaintiff's Dep. at 92 & Ex. 4 to Plaintiff's Dep.  Thus, evidence has been proffered that Plaintiff engaged in a protected activity.

### 2. that an adverse employment action was taken against Plaintiff

In November 20, 2002, Plaintiff was transferred from the brake-fill operation to the tie-rod operation.  See Plaintiff Dep. at 138; Kelly Aff. ¶¶10-14.  Although Plaintiff's pay did not change, see Plaintiff's Dep. at 151:15-17, nor did his shift, see Plaintiff's Dep. at 147:9-11, Plaintiff asserts that the transfer was an adverse employment action because the tie-rod job was more physically demanding.  See Plaintiff's Dep. at 148:1-9.  Defendant proffers that all hourly production jobs are evaluated using certain standards and that according to those standards the tie-rod operation is not more challenging than the brake-fill position.  See Broach Aff. at ¶ 7. However, for purposes of this motion, the Court must accept Plaintiff's assertion that the job is more physically demanding. The Court must now address whether the transfer was an adverse employment action because of the lone fact that Plaintiff's new job was more physically demanding.

"[D]ischarge, demotion, decrease in pay or benefits, loss of job title or supervisory

19

responsibility, or reduced opportunities for promotion [are] the typical requirements for a showing of an 'adverse employment action' that can support a Title VII claim." See Boone v. Goldin, 178 F.3d 253, 255 (4th Cir. 1999), citing Page v. Bolger, 645 F.2d 227, 233 (4th Cir. 1981). Further, "reassignment can only form the basis of a valid Title VII claim if the plaintiff can show that the reassignment had some significant detrimental effect on [him]." Boone v. Goldin, 178 F.3d 253, 256 (4th Cir. 1999). "The mere fact that a new job assignment is less appealing to the employee, however, does not constitute adverse employment action." James v. Booz-Allen & Hamilton, Inc., 368 F.3d 371, 376 (4th Cir. 2004).

Here, Plaintiff admits that there was no decrease in pay or benefits and does not proffer evidence of demotion or reduced opportunities for promotion. Plaintiff's assertion that the job is more physically demanding is not enough to support a claim that the transfer was an adverse employment action. See Boone v. Goldin, 178 F.3d 253, 256 (4th Cir. 1999) ("Absent evidence that a new position is significantly more stressful than the last, vague allegations of stress resulting from reassignment cannot support a claim of discrimination under Title VII.").

3. that there was a causal link between the protected activity and the adverse employment action

Even if the Court found that the transfer was an adverse employment action, Plaintiff has not proffered evidence that there is a causal link between the filing of his grievance against Love and his subsequent transfer by Kelly.[11] Plaintiff had no discussions with Kelly about the problems he had with Love; also, Plaintiff stated that Kelly did not know about his filed grievance against Love. See Plaintiff's Dep. at 130:15-23. Further, Kelly has stated that he did

---

[11] Kelly became his supervisor on November 4, 2002. See Plaintiff's Dep. at 130.

not know that Plaintiff had filed a grievance against Love.  See Kelly Aff. ¶ 20.

Thus, the Court **DENIES** Plaintiff's claim of retaliation.

## IV.     Virginia Human Rights Act claim

The Virginia Human Rights Act ("VHRA") applies only to employers employing more

than five but less than fifteen persons.  See Va. Code Ann. § 2.2-2639 ("No employer employing

more than five but less than 15 persons shall discharge any such employee on the basis of

race...").  It is uncontested that Defendant employed over 500 employees during the relevant time

period.  See Complaint at III.5; Answer at III.5.

Thus, the Court **DISMISSES** the Plaintiff's VHRA claim.

### CONCLUSION

The Court **DISMISSES** Plaintiff's disparate treatment claim and Plaintiff's VHRA claim.

Further, the Court **DENIES** Plaintiff's claims of hostile environment and retaliation.

Accordingly, the Court **GRANTS** Defendant's Motion for Summary Judgment.

The Clerk is **REQUESTED** to send a copy of this order to all counsel of record.

It is so **ORDERED**.


_____
/s/
HENRY COKE MORGAN, JR.
SENIOR UNITED STATES DISTRICT JUDGE


Norfolk, Virginia
August 16, 2005


21